Stoutenburgh v. Hopkins.

LUKE I. STOUTENBURGH, appellant,

v.

ABRAHAM C. HOPKINS and EMMA WESTBROOK, respondents.

1. By statute, in this state, a married woman, who was married in 1879, and who has not had issue born alive, may make a will disposing of her entire estate, real and personal, without the consent of her husband.

2. Proof of extreme physical debility of a testatrix is not sufficient to establish incapacity to make a will.

3. Where the testatrix can remember her near kindred and appreciate their claims upon her, and comprehend the amount and character of her estate, and intelligently direct its distribution, she has sufficient capacity to make a valid will.

4. A will will not be held to be the product of undue influence where a testatrix, suffering from extreme physical debility, held communications, upon the subject of making a will, with her sisters and husband, who were interested in influencing her testamentary disposition, but, at the same time, exhibited strength of mind, in resisting the importunities and remonstrances of her husband, in making a natural will, and in intelligently and properly transacting other business.

5. Fraud, in making a will, must be established by a fair preponderance of proof.

37

On appeal from a decree of the Sussex county orphans court.

*Mr. Thomas Kays*, for the appellant.

*Mr. C. J. Roe* and *Mr. J. D. Bedle*, for the respondents.

THE ORDINARY.

This appeal is from a decree of the orphans court of Sussex county, which directs that the writing, hereinafter mentioned, be admitted to probate as the last will of Martha Stoutenburgh,. deceased.

The appellant, who was the husband of Mrs. Stoutenburgh, was the caveator below.   Mr. and Mrs. Stoutenburgh were married in February, 1879, she being then about thirty-nine years of age, and he being about twenty-five years her senior.   It was her first, and his third, marriage.   He had three children by a former wife, all of whom, at the time of this marriage, were grown and independent.   He had been pastor of a Congregational church for some years, but, because of a bronchial affection, had given up preaching and taken charge of an educational institute at Schooley's Mountain.   He had some property, chiefly mining land.   Mrs. Stoutenburgh had inherited a considerable fortune from her father, and, during her marriage and at her death, was worth about $40,000.   She objected to engaging in the management of the school with which her husband was connected, and consequently induced him to change his residence to Newton, in Sussex county, and live there in her house.

In the fall of 1885 Mrs. Stoutenburgh's health began to fail, but it was not until March or April of the following year that the causes of this decline were ascertained to be uterine tumors and cancer of the stomach.

She died on Thursday, May 13th, 1886, having, two days before, executed the paper which is the subject of this controversy.

This writing purports to be her will.   It provides an annuity of $500 in favor of her husband, for his life, and divides the remainder of her estate, in equal shares, among her three sisters.

The appellant presents five reasons why the paper should not be admitted to probate :

Stoutenburgh v. Hopkins.

*First.* Because Mrs. Stoutenburgh was a married woman, and as such had no power to make a will which disposed of her estate without her husband's consent.

*Second.* Because the paper offered for probate was not executed in compliance with the requirement of the statute concerning wills.

*Third.* Because Mrs. Stoutenburgh lacked testamentary capacity at the time of the execution of the paper.

*Fourth.* Because the writing was induced by undue influence.

*Fifth.* Because the paper was procured by direct fraud.

The first of these objections was merely stated by counsel, and left, without argument, to be disposed of by me.

At common law, a married woman could not devise real estate, and was incapable of disposing of her chattels by will, without the consent of her husband. *Van Winkle* v. *Schoonmaker, 2 McCart. 384.*

The supplement to the act concerning wills, which was approved April 12th, 1864 (*P. L. p. 698*), empowered such a woman, when above the age of twenty-one years, to thereafter dispose of all her real and personal property by will, provided that such disposition should not include any interest the husband then had, or, at the wife's death, would have, in her real or personal estate. By the Revision of 1874, now in force (*Rev. p. 638 § 9*), the authority of the wife in this respect was further extended, so that she may now, by will, dispose of her entire property, except such interest as her husband would, at her death, be entitled to in her real estate.

It has been held, as to the first of these statutes (and the reasoning will apply to both), that, being in derogation of the common law, it must be strictly construed (*Compton* v. *Pierson, 1 Stew. Eq. 229*), but the validity of the legislation to empower the wife to make a will, to the extent that the language of the statute authorizes, has always been recognized in this state. *Vreeland* v. *Ryno, 11 C. E. Gr. 160; Beal* v. *Storm, 11 C. E. Gr. 372; Webb* v. *Jones, 9 Stew. Eq. 163.*

This marriage was subsequent to these statutes.

I fail to perceive, and counsel does not suggest, a reason why

they do not fully authorize the making of such a paper as that which is in dispute.

As the birth of issue alive is a requisite to the husband's estate by curtesy, and as that requisite is absent in the case under consideration, Mr. Stoutenburgh had no interest in his wife's lands at her death. Then, if the will shall be established, whatever he takes from her property must be that which the will gives him ; but, if the will shall not be established, he will be entitled, *jure mariti,* to her entire personal estate. *Donnington* v. *Mitchell, 1 Gr. Ch. 243.*

As to the second ground upon which this paper is assailed. It is admitted by the appellant that if Francis J. Swayze, one of the testamentary witnesses, can be relied upon, the writing was executed as the statute requires that a will shall be executed.

Not only the testimony of Mr. Swayze, but also that of John N. Roof, the other testamentary witness, fully establishes a strict compliance with the statute.

The attestation clause also recites the full performance of all that the statute requires, and is itself *prima facie* evidence of the facts stated in it. *Ayres* v. *Ayres, 16 Stew. Eq. 565.*

This objection to the probate of the paper has not been seriously urged, and may be dismissed without further remark.

Under the third objection to the paper in question, it is hardly pretended that Mrs. Stoutenburgh was absolutely without testamentary capacity ; but it is earnestly contended that she was in such physical and mental condition that she had become a fit subject upon which imposition and fraud might be practised.

The evidence of her attending physician establishes that, although she was emaciated, weak, nervous and irritable, she was yet in possession of her mental faculties.

Because of the cancer, she could not be adequately nourished, and died, not alone from the direct influence of the disease upon her system, but principally from gradual starvation. The physician testifies that she was never delirious, and gives it as his opinion that she was competent to transact business, but was not competent to withstand undue influences.

Stoutenburgh v. Hopkins.

The standard of testamentary capacity, in this state, is given by Mr. Justice Depue, in *Rusling* v. *Rusling, 9 Stew. Eq. 603, 607,* in his remark : ". His power to recollect his nearer kindred, and appreciate their claims upon him, to comprehend the amount and character of his estate, and to intelligently direct its distribution, does not appear to have been seriously impaired. Such capacity is sufficient for the making of a will."

The testimony to which I feel constrained to hereafter revert, abundantly satisfies me that Mrs. Stoutenburgh had sufficient capacity to make the instrument in dispute. I, however, share with her physician the opinion that one of the natural consequences of her weakness and sufferings would be the impairment of her ability to withstand improper influences and guard against fraud ; and I do not lose sight of.this important circumstance in the consideration of the remaining questions in this case.

We are indebted to Vice-Chancellor Van Fleet for a most excellent definition of that which is denominated undue influence. In *Earle* v. *Norfolk, 9 Stew. Eq. 188, 192,* he says : " All that can be safely said in the way of formulating a definition of what the law calls undue influence, is to say that whatever destroys free agency, and constrains the-person whose act is brought in judgment to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion. The extent or degree of the influence is quite immaterial, for the test is, Was the interference, whether slight or powerful, sufficient to destroy free agency and render the act brought in judgment rather the result of the determination of the mind of another than the expression of the mind of the actor ? The party alleging undue influence must prove it, either directly or by proof of such circumstances as shall clearly warrant its presumption as a conclusion of fact."

Such circumstances, as that the will was drawn by a favored legatee, extreme debility of the testatrix, clandestinity, unbounded confidence in the draughtsman of the will, coupled with like concomitants, may warrant the presumption of which the vice-chancellor speaks. *Rusling* v. *Rusling, 9 Stew. Eq. 603 ; Dale* v.

*Dale,* 11 *Stew. Eq. 274; Waddington* v. *Buzby,* 16 *Stew. Eq. 154; Brick* v. *Brick, Id. 167.*

Those who were near Mrs. Stoutenburgh, and may naturally be presumed to have a claim upon her bounty, were her husband, a brother, Joshua Hill, who resides in Kentucky, and three sisters: Emma, the wife of Lafayette Westbrook, residing at Stroudsburgh, Pennsylvania; Elizabeth, the wife of Abraham C. Hopkins, residing at Morristown, in this state, and Amanda, the wife of Ellis R. Shay, residing at Newton.

At the time of Mrs. Stoutenburgh's illness Amanda was sick at Mrs. Westbrook's house, at Stroudsburgh.

Some ill feeling, which is adverted to but not explained in the case, existed between Mrs. Stoutenburgh and her brother. It seems to have been accepted as sufficient to justify his exclusion from any testamentary remembrance.

By the law, in case of Mrs. Stoutenburgh's intestacy, the brother and sisters would, by descent, take her real estate, and the husband, *jure mariti,* as has been stated, would take her personal property. The former was valued at about $8,000, while the latter was worth fully $30,000. It is obvious that it was to the pecuniary interest of the sisters, if Mrs. Stoutenburgh was disposed to favor them in a will, that she should make such an instrument, and, on the other hand, that the making of a will was likely to be disadvantageous to the husband.

It is abundantly proven that the husband and sisters knew their legal situation with reference to Mrs. Stoutenburgh's property. Mrs. Westbrook testifies that in November, 1885, she talked to Mrs. Stoutenburgh about making a will, and about Mr. Stoutenburgh's right to the personal estate in case no will should be made, and was then assured, by Mrs. Stoutenburgh, that a will would be made, and that it was not her desire that her husband should take her property.

In March, 1886, Mrs. Stoutenburgh visited Mrs. Hopkins, in Morristown, for the purpose of conveniently consulting and being treated by a physician of note there, and in April went to New York, to Dr. Emmet, a distinguished specialist in diseases peculiar to women. Mr. Stoutenburgh accompanied his wife on both

these visits, and became aware of the causes of her ill health. After Mrs. Stoutenburgh's return to Newton, her condition became so critical and alarming that her husband thought it best to call Mrs. Hopkins to his assistance in caring for her. Mrs. Hopkins arrived on May 3d, and three or four days after her arrival, Mr. Stoutenburgh informed her of the nature of her sister's ailments.

Mrs. Hopkins testifies, that on Saturday morning, May 8th, after receiving this information, she conversed with her sister upon the subject of making a will. She states that Mrs. Stoutenburgh said that she ought to make a will, and asked who should draw it. Lawyers of Newton were suggested, and then Mrs. Hopkins remarked that she expected her husband, who is a lawyer, to arrive at Newton that afternoon. Mrs. Stoutenburgh expressed satisfaction at this information, and said that she would get him to draw her will, and then told Mrs. Hopkins that she intended to leave her husband $500 a year, and her sisters the remainder of her property, and promised that she would speak to her husband on the subject of her testamentary intentions. She further said that her brother had not treated her well, and that she would not leave him anything.

Mrs. Hopkins further says that, on the afternoon of that day, she again spoke to Mrs. Stoutenburgh, and reminded her that she must appoint executors.

That Saturday afternoon Mr. Shay, who is also a lawyer, practising in Newton, went to Stroudsburgh to visit his wife, and, on Monday morning, brought Mrs. Westbrook to Newton.

Mr. Stoutenburgh testifies that, on that Saturday afternoon (May 8th), his wife said to him :

" I am thinking of making a will ; I am very feeble, and want you to assist me in making a will ; don't you think that the larger half of my property ought to go back to my family ? "

And that he replied :

" Yes, my dear, I think it ought."

And that she then said :

" I am very weak; I want you to think of it, and help me; thinking of it worries me."

He also testifies that, on Monday morning (May 10th), having thought upon the subject of his wife's will, he went to her and told her that he had been thinking of it. She then asked him if Abraham Hopkins was there, and, upon his replying in the affirmative, said:

" I want Abie to make the will; Liz knows all about it, and whatever Liz and Abie shall do, I will agree to."

Mr. Stoutenburgh tells us that he then advised that Judge Clark should draw the will, but that she insisted that Mr. Hopkins must make it. He says that he then suggested that the testamentary witness, Francis J. Swayze, should draw it, and that she yet expressed a wish that Mr. Hopkins should do the work. He says that, again, on the forenoon of Tuesday (May 11th), he asked her if Swayze could not write the will, and that she yet adhered to her desire that Hopkins should do it, but that, in the afternoon of that day, she instructed him to call Swayze to draw it.

Mrs. Westbrook says that all she said to Mrs. Stoutenburgh on the subject of a will, during her last illness, was on the morning of the day on which the will was made, and that that entire conversation was as follows. Mrs. Stoutenburgh said:

" Em, I want to make my will to-day; I have been thinking of you and Abe for executors; will you be one?"

Mrs. Westbrook replied in the affirmative, and then said:

" If you feel able, I wish you would make—would sign Amanda's note to-day; I think you ought to do that."

And Mrs. Stoutenburgh replied:

" I am going to arrange all my business affairs to-day."

Abraham Hopkins, Mrs. Swayze, who is the mother of Francis J. Swayze, and a cousin of Mrs. Stoutenburgh, Mary Simmons,

the nurse, and Catharine Van Horn, a servant, were the only other persons who appear to have come in contact with Mrs. Stoutenburgh during the last days of her life, and they each swear that they never had any conversation with her upon the subject of a will. Mr. Shay was not sworn, but there is no evidence to indicate that he either saw or spoke with Mrs. Stoutenburgh during her last illness.

If these witnesses speak the truth, we have all that was said to the testatrix upon the subject of her will while she was confined to her room, prior to the making and execution of that instrument.

By that which Mrs. Stoutenburgh said to her husband, he was informed that it was her intention to deprive him of a portion, at least, of that which the law would give him in the event of her dying without a will; and by that which was said to Mrs. Hopkins, it was known that the sisters would profit by the making of such an instrument.

The husband and sisters then knew not only their legal rights with respect to the property of Mrs. Stoutenburgh, but also her testamentary intentions.

From this point, the evidence very plainly indicates that Mr. Stoutenburgh was determined, if possible, to prevent the making of a will, and that Mrs. Hopkins and Mrs. Westbrook, and their husbands, were equally determined that they would afford Mrs. Stoutenburgh an opportunity to make such a paper.

The following occurrence, which appears by the proofs, illustrates the situation of the parties to each other, and justifies the foregoing conclusion: On Monday afternoon (May 10th) Mr. Stoutenburgh proposed to Mr. and Mrs. Hopkins and Mrs. Westbrook that if Mrs. Stoutenburgh should be allowed to die intestate he would bind himself to secure to the sisters two-thirds of Mrs. Stoutenburgh's property, and retain for himself the remaining one-third. This proposition was rejected. He then offered to give the sisters the entire estate, if they would secure to him, for his life, the income from $12,000, and, upon objection being made to that sum, he offered to reduce it to $10,000. While these proposi-

tions were being discussed, Mr. Stoutenburgh was called to his
wife.   She seemed to be sinking rapidly.   He says:

"Her hands were clammy and cold, as a dying person; I thought she was.
dying, and asked the girls to get some brandy quickly, and I gave her the
brandy."

Mrs. Hopkins and Mrs. Westbrook followed Mr. Stoutenburgh
to their sister's bedside.   Mr. Stoutenburgh says that Mrs. Hop-
kins, after a short time, left the room, and, a minute afterward,
Mr. Hopkins appeared at the door and said to him: "The
sisters accept your proposition."

Mrs. Westbrook and Mrs. Hopkins both testify that about
this time, and just before the arrival of the physician, who had
been called, Mr. Stoutenburgh opened the door of the sitting-
room where they were, and said: "I withdraw my proposition."

The will was executed on the afternoon of Tuesday, May
11th.   It was drawn by Francis J. Swayze, the testamentary
witness above referred to.   He was a young lawyer in Newton,
and a second cousin of Mrs. Stoutenburgh.   Mr. Stoutenburgh
says that he, Stoutenburgh, was on intimate terms with Mr.
Swayze, being interested with him in educational and church
matters, and that he esteemed him very highly.

It appears that upon Monday, May 10th, Mr. Shay asked
Swayze if he would be a witness to the will which Hopkins was
to draw, and that then he and Hopkins talked with Swayze
about the will, and that on Tuesday, when Mr. Stoutenburgh
asked Mr. Swayze to draw the will, he told Stoutenburgh that
Shay and Hopkins had spoken to him of the will, and that he
did not wish Mr. Stoutenburgh to tell him anything which
would embarrass him with confidential communications from
both sides.

At about four o'clock on the afternoon of Tuesday, May 11th,.
Mr. Swayze went to Mrs. Stoutenburgh to draw the will.   He
was ushered into the sitting-room, where he found Mr. Stouten-
burgh, Mr. and Mrs. Hopkins and Mrs. Westbrook.   After he
entered, Mr. Stoutenburgh said "the friends" had desired a
will; that he had consulted the attending physicians, and that

Stoutenburgh v. Hopkins.

they each thought that Mrs. Stoutenburgh was in a very precarious condition, and could not transact any business.

Mr. Swayze said that he could not be guided by Mr. Stoutenburgh's statements; that if Mrs. Stoutenburgh desired him to draw her will, he would take her instructions. He was then called by some one to see Mrs. Stoutenburgh. He says that when he entered her bed-room, her attendant, Miss Simmons, retired, and he took a seat at the bedside; that Mrs. Stoutenburgh was silent for some time, and then turned to him and said that she desired to make some disposition of her property, and, upon his saying that he was there to take her instructions, she very slowly dictated, and he wrote that which she said almost *verbatim*. At the conclusion of the interview he went back to the sitting-room to draw the will, and then Mr. Stoutenburgh asked if it would be proper to read the instructions he had received. Mr. Swayze thought not, without Mrs. Stoutenburgh's consent, and returned to her room and obtained the desired permission, and then read the instructions to those who were in the sitting-room. The instructions were, shortly, that Mr. Stoutenburgh was to have an annuity of $500 for his life, and that the remainder of the property was to be divided equally between the sisters. Mr. Stoutenburgh said that the instructions showed clearly that his wife was incompetent to make a will; that she had talked very differently to him. He then went out and returned with a paper, and read from it a conversation with his wife to the effect that he was to have $1,200 a year. Mr. Swayze says that he, Swayze, then went to Mrs. Stoutenburgh and interrogated her again about the amount of the annuity, and that she distinctly said to him that it should be $500 a year.

Mr. Stoutenburgh says that, after Swayze had taken his instructions, Mrs. Stoutenburgh sent for him (Stoutenburgh), and said: " I want to make provision upright—to provide for you." That she spoke in a voice that he could hear, but very feeble; she said: " I want—provide—for you twelve hundred—I—." He says that he then asked which she meant—twelve or five? and she said: " Did I say twelve? Five hundred a year. If not enough, make it more; I have confidence in you."

This conversation is probably that which he read, as above stated, and which caused Mr. Swayze to go for further instructions, for Mr. Stoutenburgh does not speak of any other conversation at which the amount $1,200 was mentioned, and he says that he has named all the conversations he had with his wife on the subject of a will.

Swayze then drew the will, and read it aloud. Mr. Hopkins objected that it did not state that the division between the sisters was to be share and share alike; and Mr. Stoutenburgh insisted that the provision as to his annuity should be in the exact words of his wife. Mr. Swayze then redrew the will to satisfy both these gentlemen, complying, as far as his instructions would allow him, with their requests. Mr. Roof, a neighbor, was then called, by permission of Mrs. Stoutenburgh, to act as a witness.

Mr. Stoutenburgh says that, just before the will was completed, his wife sent for him, and said that she desired that his annuity should be applied to the payment of two notes that he had given her for moneys that she had loaned to him, which, with interest, amounted to about $8,000, until the notes should be paid, and that he remonstrated that such a payment would make him poor; and that she said that there would be nothing left, then, for her poor sisters. He does not appear to have communicated this conversation to Mr. Swayze. The latter says that, while waiting for Mr. Roof to come, he went to the bedroom and read the will to Mrs. Stoutenburgh; and that then Mr. Roof, Mr. Stoutenburgh, Mrs. Hopkins and Mrs. Westbrook came into the room, and Mr. Hopkins followed them as far as the door. After they entered, Mrs. Stoutenburgh said to her husband: "Pa—those notes of yours." And Mr. Stoutenburgh drew near her, while Swayze walked out of hearing. Mr. Swayze says that he knew that Mrs. Stoutenburgh was insisting upon something, and that her husband was trying to quiet her.

Mr. Swayze says that he then went to the bed, and explained to Mrs. Stoutenburgh each provision of the will, as he had drawn it, and asked her if she understood it, and that she replied in the affirmative to each question. After this she was raised up in the bed, and Mr. Stoutenburgh took a position behind her, apparently

to support her.  A book was procured for her to write upon.
After hesitating a moment, as if to gather strength, for she was
undoubtedly extremely feeble, she took the pen and asked where
she should sign.  As she signed, Mr. Stoutenburgh held her fore-
arm, he says, to assist her.  The signature was broken, as if the
pen had slipped in the word "Stoutenburgh."  She remarked that
it was not straight and good, and attributed the fault to the light
in the room.  The light was not good.  Mr. Swayze then asked
her if she declared the instrument to be her will, and desired him
and Mr. Roof to witness it, and, upon her replying in the affirm-
ative, the testamentary witnesses signed in her presence.  While
they signed, her head drooped a little with fatigue; but, upon
Mr. Swayze's calling her attention to the necessity of her seeing
the witnesses sign, she looked directly at them.  She then sug-
gested that she should endorse a check that had been sent to her
by Mr. Stoutenburgh's son for some interest that he had col-
lected for her, and Mr. Stoutenburgh left his position behind
her to get the check, and some other person supported her in his
stead.  When the check was produced, she endorsed it with a
strong, straight and regular signature.  In making this signature,
she remarked that she had failed to cross the $t$'s, and, with the
pen, crossed them.

Mrs. Shay had visited Europe some time previously, and left
her securities and moneys in the care of Mrs. Stoutenburgh.
During her absence Mrs. Stoutenburgh had collected several
thousand dollars, and paid out, for Mrs. Shay, considerable sums
of money.  Some time in April Mrs. Stoutenburgh and Mr.
Shay had adjusted this account between the sisters, and found
that Mrs. Stoutenburgh was indebted to Mrs. Shay in a sum ex-
ceeding $4,000.  After endorsing the check for interest, Mrs.
Stoutenburgh said: "I want to sign that note of Joe's" (Mrs.
Shay); and, turning to Mr. Stoutenburgh, said: "Pa, have
you the statement of account?"  Mr. Stoutenburgh then got the
statement, and Mr. Swayze drew a note to Mrs. Shay for the
balance due to her, and Mrs. Stoutenburgh signed it.  This
signature is also strong and well formed.  She then spoke of
signing a certificate of satisfaction of a mortgage that had been

Stoutenburgh v. Hopkins.

paid by one Divers, but she was advised that there was no neces-sity to then tax her strength in doing so. Mr. Roof, the sub-scribing witness, a neighbor of Mrs. Stoutenburgh, and entirely disinterested in the event of this controversy, says that Mrs. Stout-enburgh was emaciated, and very weak, but that she spoke in a tone above a whisper, and replied to all of Mr. Swayze's ques-tions understandingly.

I fail to detect in the evidence that which would justify me in saying that Mrs. Stoutenburgh was unduly influenced to make the will in question. I think that she followed the dictates of her own judgment in the uncontrolled exercise of her free agency. Notwithstanding her weakness and suffering, she exhibited re-markable strength in resisting her husband's importunity that Swayze should draw the will, and his remonstrance, when she sought to exact the payment of his notes. Her will was a natural one. Her sisters were of her own blood, and closely bound to her by the ties of sisterly affection, while her husband was an old man, to whom she had been married, late in life, for a comparatively short time, with grown-up children in whom she took but little interest. Her property had come to her from her father, and it was but natural that it should be her desire to have it go to his descendants. Her husband had property of his own, and independent children upon whom he could rely in case of necessity. It was not unnatural or unreasonable, under such circumstances, that she should provide for him as she did, and give the principal of her estate to her sisters.

The position of Mr. Swayze, in this contest, is hardly an envi-able one. Because of his relationship to Mrs. Hopkins and Mrs. Westbrook, and his remark to Mr. Stoutenburgh, to the effect that he could not accept the confidence of both parties interested in the will, his testimony is assailed as unworthy of belief, and he is charged with entering into a conspiracy to extort the will in question. The criticism goes too far. The testimony of Mr. Swayze possesses many features which impress me with its truth-fulness. His admission of the remark alluded to is, itself, a feature of this kind. He appears to be a lawyer of intelligence, and must have realized that to admit that he had been the recipi-

ent of the confidence of Messrs. Hopkins and Shay would subject him to a charge of bias in favor of the proponents, and to the reproach that he did not possess a nice sense of professional ethics in undertaking, after such a confidence, a task which would require so much apparent, as well as real, freedom from bias, and also delicacy, honesty, impartiality and good judgment.

Not only was the admission against his interest, but it was against the interest of the proponents that the draughtsman of the will should be thought to be their coadjutor, for the rule of the Roman law that he who writes himself an heir can take no benefit under the will, is, in our law, a potent factor in raising a presumption of the use of undue influence.   If we are to believe him to be untruthful, and a conspirator with the proponents, as the appellant insists, it is difficult to explain why he made this admission.   I think that the admission was due to his truthfulness, and that the remark itself meant no more than that Mr. Hopkins and Mr. Shay had informed him of the attempted compromise of Monday afternoon, and the attitude of the parties during the alarm as to Mrs. Stoutenburgh's condition, and that he determined that he would not become involved in an unseemly family strife by receiving further confidences.   His subsequent evident determination to take instructions from Mrs. Stoutenburgh alone, and the care he exercised in ascertaining if she fully understood the will, convince me that he not only fully realized the importance and delicacy of the situation in which he was placed, and resolved that Mrs. Stoutenburgh should make a will, if she pleased to do so, but that he acted disinterestedly and honestly in the performance of his duties.

Nor do I think that the remark of Mrs. Stoutenburgh, to which her husband testifies: " I want Abie [Mr. Hopkins] to make the will; Liz [Mrs. Hopkins] knows all about it, and whatever Liz and Abie shall do, I will agree to," indicates, as it was argued, a mind under an overpowering influence. Mrs. Hopkins swears, as has been stated, that, on Saturday morning, May 8th, Mrs. Stoutenburgh had expressed a desire that Mr. Hopkins should draw the will, and had declared that by it she would give her husband an annuity and her sisters the residue

of her estate, and had promised to mention the matter to her husband. Mr. Stoutenburgh testifies that, on Saturday afternoon, his wife spoke to him about a will, and went so far as to state that she would leave the bulk of her property to her family, and seemingly, in asking his assistance, gave him her confidence. The criticised remark was made on the following Monday, when Mr. Stoutenburgh came to her to advise as to her will. She evidently had not then the courage to make known to him her full resolve, but sought refuge from the excitement which would follow its disclosure by saying that her sister knew of her intention, and that the sister's husband would draw the will.

The case affords no better proof of Mrs. Stoutenburgh's strength to form and maintain her purpose than is found in the appellant's account of her resistance of his importunities, and her determination that he should pay his notes. But I do not forget that the testimony as to the objectionable remark comes from the appellant alone, without the possibility of his contradiction. At the time he heard it, he was hardly in a condition of mind to receive and remember it without (unconsciously, perhaps) changing it in some respect to conform to his interest. I have misgivings as to its accuracy, particularly when I consider the evidence upon which the next and last objection to the probate of the paper in question is based.

The fifth objection to the admission of the will to probate that it was procured by direct fraud, is supported by the testimony of Mr. Stoutenburgh that just prior to the execution of the will, as Mr. Swayze was reading it to Mrs. Stoutenburgh, she said to Swayze: " I want you to put in the will that the legacy of Mr. Stoutenburgh is to be used every year in the payment of that note until it is all paid." And that Mr. Swayze looked at her and said, " That is confusing," or, " That will confuse," and then left his position, moved to the piano, and then to the door, where Mr. Hopkins stood, and then returned to the bed and said, " It is now ready," and went on with the execution of the will, without again reading it.

Mr. Swayze denies that any remark of this kind was made to him, and denies that he made the reply attributed to him, and

all the other persons who were in the room deny that they heard a conversation of this kind.

It will be noted in the statement I have made of this testimony that Mr. Stoutenburgh speaks of an interview he had with his wife just before the will was executed, when she sent for him, and said that she desired that his annuity should be applied to the payments of his notes, to which he replied that that would make him poor; and that Mr. Swayze speaks of a conversation, about the same time, between Mr. and Mrs. Stoutenburgh, which Mrs. Stoutenburgh commenced with the words, " Pa, those notes of yours "—and from which Swayze retired.   Mr. Swayze says that he did not hear all this conversation.   He thinks the sentence, in part given, was finished with the words, " They will be paid, won't they ?"   But he is not certain.   He witnessed the interview, and was impressed that Mrs. Stoutenburgh was insisting upon something, and that her husband was remonstrating with her against it.

I cannot but think that these conversations are identical, and that Mr. Stoutenburgh, now, believing that he will be obliged to pay his notes at once, upon reflection, considers it more advantageous to pay them as his wife desired, and he seeks to charge, forgetful of his remonstrance with his wife, that, by fraud, the provision applying his annuity to their payment was not incorporated in the will.   It is to be borne in mind that he was jealously watchful of all that was done and said at the execution of the will.   Why did he not then denounce the fraud in the presence of his wife, and demand that her wish be complied with ?   Did he mean to acquiesce in it ?   Did he mean to reserve his knowledge of it for use in this contest ?   Or, is the testimony concerning it a fabrication to aid in this litigation ?   It is his duty to establish the fraud by fair preponderance of proof.   He has failed to do so.

I am of opinion that the proofs do not sustain any of the objections urged by the appellant, and I will, therefore, affirm the decree of the orphans court, with costs.